FILED

2016 JUN 16  PM 5: 38

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2015 Grand Jury

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

DONALD WOO LEE,
  aka "Donald Lee,"
  aka "Donald Woolee,"

        Defendant.

No. CR16-0415

I N D I C T M E N T

[18 U.S.C. § 1347: Health Care
Fraud; 18 U.S.C. § 2(b): Causing
an Act to be Done; 18 U.S.C.
§§ 981(a)(1)(C), 982(a)(7);
28 U.S.C. § 2461(c): Criminal
Forfeiture]

The Grand Jury charges:

COUNTS ONE THROUGH SEVEN

[18 U.S.C. §§ 1347, 2(b)]

A.   INTRODUCTORY ALLEGATIONS

    At all times relevant to this Indictment:

    1.   Defendant DONALD WOO LEE, M.D., also known as ("aka")
"Donald Lee," aka "Donald Woolee" ("LEE"), was a physician who
owned, operated, and oversaw a medical clinic located at
27555 Ynez Road Suite 105, Temecula, California, within the
Central District of California ("Temecula Clinic").  Defendant
LEE also owned, operated, and oversaw a medical clinic located

1   at 10241 Country Club Drive, Suite H, Mira Loma, California,

2   within the Central District of California ("Mira Loma Clinic").

3       Prime Partners Medical Group, Inc.

4       2.   On or about July 10, 2002, defendant LEE filed a

5   Certificate of Amendment with the California Secretary of State

6   in which he renamed an existing corporation, Donald Woo Lee,

7   M.D., Inc., as Prime Partners Medical Group, Inc.   ("Prime

8   Partners").

9       3.   On or about February 21, 2006, defendant LEE, as the

10  President of Prime Partners, opened corporate bank account

11  number ****-3161 at Pacific Western Bank ("Pacific Western

12  Account").   Defendant LEE was the sole authorized signatory on

13  this account.

14      4.   On or about August 12, 2013, a Statement of

15  Information was filed with the California Secretary of State for

16  Prime Partners.   This Statement of Information listed defendant

17  LEE as the Chief Executive Officer, Secretary, Chief Financial

18  Officer, and Agent for Service of Process, and identified the

19  Temecula Clinic as Prime Partners' business address.

20      5.   On or about November 19, 2013, defendant LEE, as the

21  Chief Executive Officer of Prime Partners, opened corporate bank

22  account number ***-9662 at Rabobank, N.A. ("Rabobank Account

23  1").   Defendant LEE was an authorized signatory on this account.

24      6.   On or about December 10, 2013, defendant LEE executed

25  and submitted an electronic funds transfer agreement ("EFT") to

26  Medicare to receive payment by electronic transfers into

27  Rabobank Account 1.

28

1       7.  On or about April 30, 2014, defendant LEE executed and

2  submitted an enrollment application to Medicare adding a

3  practice location.

4       8.  On or about September 29, 2014, defendant LEE executed

5  and submitted an enrollment application to Medicare adding

6  another practice location.

7  <u>Donald Woo Lee, M.D., A Professional Corporation</u>

8       9.  On or about April 13, 2015, defendant LEE incorporated

9  "Donald Woo Lee, M.D., A Professional Corporation," with a

10  business address at the Temecula Clinic.

11      10.  On or about April 16, 2015, a Statement of Information

12  was filed with the California Secretary of State for "Donald Woo

13  Lee, M.D., A Professional Corporation."  This Statement of

14  Information listed defendant LEE as the Chief Executive Officer,

15  Secretary, Chief Financial Officer, and Director, and identified

16  the Temecula Clinic as the business address for "Donald Woo Lee,

17  M.D., A Professional Corporation."

18      11.  On or about April 20, 2015, defendant LEE, as the

19  Chief Executive Officer of "Donald Woo Lee, M.D., A Professional

20  Corp.," opened corporate bank account number ****-2496 at

21  Rabobank, N.A. ("Rabobank Account 2").  Defendant LEE was the

22  sole authorized signatory on this account.

23      12.  On or about May 14, 2015, defendant LEE executed and

24  submitted an initial enrollment application to Medicare

25  enrolling "Donald Woo Lee, M.D., A Professional Corporation" for

26  the Temecula Clinic and the Mira Loma Clinic.

27  ///

28  ///

3

13.   On or about May 14, 2015, defendant LEE executed and submitted an EFT to Medicare, to receive payment by electronic transfers into Rabobank Account 2.

14.   In or around July 2015, after Security Bank of California purchased Rabobank, Rabobank Account 2 became Security Bank of California account number ****-1302 ("Security Bank Account").

15.   On or about July 31, 2015, defendant LEE executed and submitted an EFT to Medicare, to receive payment by electronic transfers into the Security Bank Account.

16.   On or about September 24, 2015, defendant Lee executed and submitted an Electronic Data Interchange Agreement ("EDI") to Medicare.

Medicare Claims Submitted by defendant LEE

17.   Between September 2012 and September 2015, defendant LEE submitted and caused the submission of approximately $14,699,359 in claims to Medicare, of which approximately $12,448,300 was for vein ablation procedures and related procedures.   Of the amounts claimed, Medicare paid defendant LEE $5,172,808, of which $4,576,861 was for vein ablation procedures and related procedures.

Vein Ablation Procedures

18.   Patients with varicose veins sometimes also had venous reflux, that is, a condition in which blood in the patient's veins flowed wrongly away from the heart rather than towards the heart.   The condition could cause the patient's blood to pool in the veins of the patient's lower legs, leading to enlargement of the veins, and potentially causing a variety of symptoms such as

4

1  leg pain, leg heaviness, and leg fatigue, among others.  In
2  advanced cases, leg swelling, dermatitis, inflammation and
3  hardening of the skin, and/or discoloration of the skin could
4  occur. In the most advanced cases, skin ulceration could also
5  develop.

6      19.  In such situations, a vein ablation procedure was used
7  to treat potentially significant health issues arising from the
8  condition.  There were various types of vein ablation procedures,
9  including a radiofrequency vein ablation procedure and an
10 endomechanical vein ablation procedure.

11     20.  The radiofrequency vein ablation procedure used a
12 generator unit attached by a long cord to a long, thin
13 disposable catheter.  During this procedure, a physician
14 inserted the catheter into the patient's vein.  An ultrasound
15 device guided the catheter into and through the varicose vein,
16 until the catheter reached the end of the varicose vein or the
17 varicose segment of the vein.  As the catheter, guided by
18 ultrasound, was gradually pulled out of the vein, radiofrequency
19 waves were emitted to collapse the vein.  When the catheter was
20 completely removed, the vein was entirely collapsed.  After a
21 successful procedure, the patient's blood naturally found new
22 paths through smaller, healthier veins.

23     21.  The endomechanical vein ablation procedure was a
24 minimally invasive treatment for varicose veins, combining
25 mechanical and chemical modalities.  The procedure was performed
26 with a special, one-time use, percutaneous infusion catheter,
27 which contained a rotating wire that provided endovenous
28

1   mechanical destruction and simultaneously dispersed a physician
2   specified agent (sclerosant) in the targeted vein.  Like the
3   radiofrequency vein ablation procedure, successful execution of
4   the endomechanical vein ablation procedure would result in the
5   blood previously at risk of pooling finding healthier veins
6   through which to flow.
7        The Medicare Program
8        22.  Medicare was a federal health care benefit program,
9   affecting commerce, that provided benefits to individuals who
10  were 65 years and older or disabled.  Medicare was administered
11  by the Centers for Medicare and Medicaid Services ("CMS"), a
12  federal agency under the United States Department of Health and
13  Human Services.  Medicare was a "health care benefit program" as
14  defined by Title 18, United States Code, Section 24(b).
15       23.  Individuals who qualified for Medicare benefits were
16  referred to as Medicare "beneficiaries."  Each beneficiary was
17  given a unique health insurance claim number ("HICN").
18  Physicians and other health care providers that provided medical
19  services that were reimbursed by Medicare were referred to as
20  Medicare "providers."
21       24.  To participate in Medicare, providers were required to
22  submit an application in which the provider agreed to comply
23  with all Medicare-related laws and regulations.  If Medicare
24  approved a provider's application, Medicare assigned the
25  provider a Medicare "provider number," which was used for
26  processing and payment of claims.
27
28

25.    A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services rendered to Medicare beneficiaries.

26.    Medicare generally reimbursed a provider for physician services that were medically necessary to the health of the beneficiary and were personally furnished by the physician or the physician's employee under the physician's direction.

27.    CMS contracted with regional contractors to process and pay Medicare claims.  Noridian Administrative Services ("Noridian") was the contractor that processed claims involving Medicare Part B physician services in Southern California from approximately September 2013 to the present.  Prior to that, from approximately 2009 to approximately August 2013, the contractor for Part B physician services was Palmetto GBA.

28.    Providers, including defendant LEE, submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that they: (a) were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; (b) would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so; and (c) would submit claims that were accurate, complete, and truthful.

29.    A Medicare claim for payment was required to set forth, among other things, the following: the beneficiary's name and unique Medicare identification number; the type of services provided to the beneficiary; the date that the services were provided; and the name and National Provider Identifier ("NPI") of the provider who provided the item or service.

7

30.   Medicare reimbursed providers for the radiofrequency and endomechanical vein ablation procedures only in certain circumstances.   In particular, Medicare required providers seeking reimbursement for such procedures to use and document non-invasive conservative treatments for a specified period before performing the invasive procedures.   The conservative treatments to be attempted during this period, which under Medicare guidelines was required to last six to eight weeks, included but were not limited to, the deployment of non-invasive treatment options such as regular leg elevation, rest, and the use of compression stockings.   If conservative treatments were not used and documented during the requisite period, then Medicare would not deem radiofrequency and endomechanical vein ablation to be medically necessary procedures.

31.   Medicare reimbursement amounts are determined according to the Current Procedural Terminology ("CPT") code for a certain procedure, service, or product.   If a patient required two or more vein ablation procedures in a single extremity, then the provider generally was required to perform these procedures at the same time.   If a provider performed two or more procedures in a single extremity at the same time, then the provider billed for these additional "piggyback" procedures using a certain CPT code, which had a significantly lower reimbursement rate than the "parent" CPT code.

B.   THE SCHEME TO DEFRAUD

32.   Beginning at least as early as in or around September 2012, and continuing at least through in or around September 2015, in Riverside County, within the Central District of

1  California, and elsewhere, defendant LEE, together with others
2  known and unknown to the Grand Jury, knowingly, willfully, and
3  with intent to defraud, executed, and attempted to execute, a
4  scheme and artifice: (a) to defraud a health care benefit
5  program, namely Medicare, as to material matters in connection
6  with the delivery of and payment for health care benefits,
7  items, and services; and (b) to obtain money from Medicare by
8  means of material false and fraudulent pretenses and
9  representations and the concealment of material facts in
10 connection with the delivery of and payment for health care
11 benefits, items, and services.
12      33.  The fraudulent scheme operated, in substance, as
13 follows:
14      a.   Defendant LEE falsely represented, and caused
15 other to falsely represent, to Medicare beneficiaries that they
16 needed vein ablation procedures, when in fact, as defendant LEE
17 then well knew, the beneficiaries had no visible signs of
18 varicose veins, had no adverse symptoms from varicose veins, and
19 had no medical need for a vein ablation procedure to be
20 performed on them.
21      b.   Despite the fact that Medicare required
22 conservative treatments to be used and documented for a six-week
23 to eight-week period before a vein ablation procedure would be
24 considered medically necessary, defendant LEE did not employ any
25 conservative treatments on the Medicare beneficiaries before
26 performing the vein ablation procedures.  Defendant LEE
27 performed invasive vein ablation procedures without having
28 followed the required conservative treatments and despite the

9

1   absence of extreme varicosity, on Medicare beneficiaries
2   including the following, identified by their initials: D.F.,
3   F.S., O.P., S.M., C.C., D.P., and R.O.
4           c.   Defendant LEE also performed multiple vein
5   ablation procedures on Medicare beneficiaries on different
6   occasions even though the procedures could have all been
7   provided on a single occasion.  The purpose of performing
8   multiple procedures on different occasions was to enable
9   defendant LEE to increase the amount he could bill to Medicare.
10  Defendant LEE performed between two and seven procedures on
11  different dates, in violation of Medicare's "global"
12  requirement that the procedures be performed on the same date,
13  if possible, on Medicare beneficiaries including the following,
14  who are identified by their initials: D.F., F.S., K.C., O.P.,
15  S.M., C.C., and D.P.
16          d.   Defendant LEE, together with others known and
17  unknown to the Grand Jury, submitted and caused the submission
18  of false and fraudulent claims to Medicare for reimbursement for
19  the vein ablation procedures.  When defendant LEE submitted and
20  caused the submission of these claims, defendant LEE knew that
21  the procedures were medically unnecessary.  On some occasions,
22  defendant LEE submitted and caused the submission of claims to
23  Medicare for services that were never actually provided to the
24  Medicare beneficiaries.
25  C.   EXECUTIONS OF THE FRAUDULENT SCHEME
26      34.   On or about the dates set forth below, within the
27  Central District of California, and elsewhere, defendant LEE,
28  together with others known and unknown to the Grand Jury,

1  knowingly and willfully executed and attempted to execute the

2  fraudulent scheme described above, by submitting and causing to

3  be submitted to Medicare for payment the following false and

4  fraudulent claims:

| COUNT | BENE-FICIARY | APPROX. DATE ALLEGED SERVICES PERFORMED | APPROX. DATE CLAIM SUBMITTED | ALLEGED SERVICES AND SERVICE CODE | APPROX. AMOUNT OF CLAIM | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ONE | C.C. | 03/09/2013 | 03/25/2013 | Destruction of insufficient vein of arm or leg, accessed through the skin, Code 36475 | $3,000 | 540913 084573 560 |
| TWO | C.C. | 03/16/2013 | 03/25/2013 | Destruction of insufficient vein of arm or leg, accessed through the skin, Code 36475 | $3,000 | 540913 084573 550 |
| THREE | S.M. | 02/24/2014 | 03/04/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540214 064014 310 |
| FOUR | F.S. | 06/14/2014 | 06/30/2104 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540914 181348 510 |

///

///

| COUNT | BENE- FICIARY | APPROX. DATE ALLEGED SERVICES PERFORMED | APPROX. DATE CLAIM SUBMITTED | ALLEGED SERVICES AND SERVICE CODE | APPROX. AMOUNT OF CLAIM | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| FIVE | S.M. | 06/16/2014 | 6/25/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540914 176195 600 |
| SIX | C.B. | 11/08/2014 | 11/17/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540214 322140 730 |
| SEVEN | P.C. | 12/01/2014 | 12/17/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540914 351829 830 |

FORFEITURE ALLEGATION

[18 U.S.C. §§ 982(a)(7), 981(a)(1)(C) and

28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2(a) Fed. R. Crim. P., notice is hereby given to defendant DONALD WOO LEE, M.D., also known as ("aka") "Donald Lee," aka "Donald Woolee" ("LEE"), that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction under any of the Counts One through Seven of this Indictment.

2.    Defendant shall forfeit to the United States the following property:

a.    All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense set forth in any of Counts One through Seven of this Indictment; and

b.    A sum of money equal to the total value of the property described in subparagraph a.

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence;

1  (b) has been transferred, sold to or deposited with a third

2  party; (c) has been placed beyond the jurisdiction of the Court;

3  (d) has been substantially diminished in value; or (e) has been

4  commingled with other property that cannot be divided without

5  difficulty.

6

7                                          A TRUE BILL

8                                          /s/

9                                          _____
                                           Foreperson

10 EILEEN M. DECKER

11 United States Attorney

12

13 LAWRENCE S. MIDDLETON
   Assistant United States Attorney

14 Chief, Criminal Division

15 GEORGE S. CARDONA
   Assistant United States Attorney

16 Chief, Major Frauds Section

17 RANEE KATZENSTEIN
   Assistant United States Attorney

18 Deputy Chief, Major Frauds Section

19 PABLO QUIÑONES

20 Deputy Chief, Fraud Section
   United States Department of Justice

21

22 DIIDRI ROBINSON
   Assistant Chief, Fraud Section

23 United States Department of Justice

24 BLANCA QUINTERO
   Trial Attorney, Fraud Section

25 United States Department of Justice

26

27

28

                              14